IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ANGELINA BAUCUM,                    :
                                    :
            Plaintiff               :
                                    :
      v.                            :     CIVIL NO. 3:12-CV-02015
                                    :
CAROLYN W. COLVIN, ACTING           :     (Judge Brann)
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
            Defendant               :

## MEMORANDUM

## Introduction

Plaintiff Angelina Baucum has filed this action seeking review of a decision
of the Commissioner of Social Security ("Commissioner") denying Baucum's
claims for social security disability insurance benefits and supplemental security
income benefits.

Disability insurance benefits are paid to an individual if that individual is
disabled and "insured," that is, the individual has worked long enough and paid
social security taxes. The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  Baucum met the

insured status requirements of the Social Security Act through December 31, 2010. Tr. 16, 109.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Baucum protectively filed her applications for social security disability insurance benefits and supplemental security income benefits on April 14, 2009. Tr. 109. Baucum claims that she became disabled on March 1, 2008. Tr. 113. Baucum has been diagnosed with several impairments, including major depressive disorder, personality disorder not otherwise specified, attention deficit disorder, hyperlipidemia, type II diabetes, obesity, and allergies. Tr. 17, 172, 175. On August 12, 2009, Baucum's applications were initially denied by the Bureau of Disability Determination. Tr. 61, 65.

On October 15, 2009, Baucum requested a hearing before an administrative law judge ("ALJ"). Tr. 70. The ALJ conducted a hearing on September 9, 2010; Baucum did not have representation at the hearing. Tr. 38-57. On September 23, 2010, the ALJ issued a decision denying Baucum's applications. Tr. 14-25. On

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

August 8, 2012, the Appeals Council declined to grant review.  Tr. 1.  Baucum

filed a complaint before this Court on October 5, 2012.   Supporting and opposing

briefs were submitted and this case became ripe for disposition on March 21, 2013,

when Baucum declined to file a reply brief.

　　　　Baucum appeals the ALJ's determination on five grounds: (1) the ALJ erred

at step three of the sequential evaluation process by finding that Baucum did not

meet or equal listings 12.04 or 12.08, (2) the ALJ failed to properly evaluate

Baucum's credibility, (3) the ALJ failed to account for the side effects of

Baucum's medications, (4) the ALJ erred in finding that Baucum could perform

work at any exertional level, and (5) the ALJ did not adequately explain the

potential consequences of proceeding without representation.  For the reasons set

forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

　　　　Baucum is 35 years of age, has a GED, has obtained a degree in nursing, and

is able to read, write, speak, and understand the English language.  Tr. 42-43.

Baucum has past relevant work in customer service, which is sedentary, semi-

skilled work, and as a nurse, which is classified as medium, skilled work.  Tr. 53.

### A.    Baucum's Mental Impairments

　　　　On June 26, 2008, Baucum presented to Carol Bebenek, LPC at

Progressions Group for an initial intake.  Tr. 151.  At this session, Baucum

reported that she had been depressed since she "was a teenager" and had her first outpatient treatment at the age of fifteen or sixteen.  Tr. 151-52.  Baucum also reported that she was having financial problems since she had left her job due to her mother's cancer.  Tr. 154.  Ms. Bebenek noted that Baucum had some affective symptoms, including: vegetative signs, suicidal thoughts, crying, irritability, lability of mood, and distractibility.  Tr. 155.  At an appointment at Black Creek Health Center that same day, Baucum was put on Zoloft for the first time.[2]  Tr. 180.

On July 16, 2008, Baucum presented to Black Creek Health Center for a follow-up appointment.  Tr. 179.  Baucum reported that she remained tired and still had "no desire to do anything."  Id.  However, Baucum also reported that since beginning Zoloft she was not crying as much was "not as tearful."  Id.  On October 30, 2008, Baucum presented for a fifteen-minute medication management appointment at Progressions Group.  Tr. 160.  Baucum was compliant with her medications, reported no side effects, and was reportedly "stable" on her medications of Zoloft and Trazadone.  Id.  Baucum was cleanly groomed, sleeping normally, and had a normal appetite.  Id.  Additionally, she had no suicidal or homicidal ideations, was cooperative, had organized speech and thought, was not

---

[2] The physician signature on this document is illegible.

paranoid, and had no delusions or hallucinations. <u>Id.</u>  However, Baucum had an anxious mood and blunted affect. <u>Id.</u>

On December 30, 2008, Baucum returned to Progressions Group for a medication management appointment. Tr. 159. She was still compliant with her medications, reported no side effects, and remained stable on Zoloft and Trazadone. <u>Id.</u> Baucum had normal sleep and appetite, and was not suicidal or homicidal. <u>Id.</u> She had a neutral mood, broad affect, was cooperative, and had organization thoughts and speech. <u>Id.</u> Baucum reported that she was not suffering from paranoia, hallucinations, or delusions. <u>Id.</u>

On March 26, 2009, Baucum presented to Andrew Newton, M.D., at New Beginnings for a medication management appointment. Tr. 174. Baucum reported having depression and anxiety symptoms for years. <u>Id.</u> Baucum's appearance was within normal limits, her thought process and content was normal, she was alert and oriented, and her insight and judgment were age appropriate. <u>Id.</u> However, she suffered from psychomotor agitation, had delayed and soft speech, a dysthymic mood, as well as a restricted, blunt, and flat affect. <u>Id.</u> Dr. Newton assigned a GAF score of 60.[3] <u>Id.</u>

---

[3] A GAF score between 51 and 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 34 (4th ed., Text rev., 2000).

At a follow-up appointment on April 24, 2009, Dr. Newton noted that Baucum appeared disheveled, had psychomotor retardation, delayed and soft speech, a dysthymic and irritable mood, a restricted affect, poor attention and concentration, and impaired cognition, insight, and judgment. Tr. 173. However, Dr. Newton believed that Baucum had a goal directed thought process and was alert and oriented. Id. Baucum complained that she was excessively tired and slept too much. Id. Dr. Newton assigned a GAF score of 40.[4] Id.

At another medication management appointment on June 18, 2009, Dr. Newton noted that Baucum was "doing better and sleeping better." Tr. 172. Her appearance and behavior were within normal limits, her speech was normal, her mood was euthymic, and her affect was mood-congruent. Id. Baucum's thought process was goal directed; she was alert and oriented; her cognition was grossly intact; and she had normal attention and concentration. Id. Baucum's insight and judgment were only fair. Id. Dr. Newton diagnosed Baucum with attention deficit disorder, personality disorder not otherwise specified, and major depressive disorder. Id.

On May 26, 2010, Baucum was examined by Samuel Garloff, D.O., at New Beginnings for a medication management appointment. Tr. 235. Dr. Garloff noted

---

[4]   A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

that he had not examined Baucum since January 2010,[5] and since then Baucum had taken herself off of Dexedrine.  Id.  Dr. Garloff observed that Baucum had good hygiene, was oriented, had good psychomotor activity, and a level affect.  Id. Although Baucum had a depressed mood, she was not suicidal or homicidal.  Id. Baucum requested an increased in her Zoloft dose because she thought that, after being on Zoloft for one year, she "should feel better by now."  Id.  Dr. Garloff assigned a GAF score of 55.  Id.

On August 12, 2009, Michael Suminski, Ph.D., completed a mental residual functional capacity assessment.  Tr. 202-18.  Dr. Suminski opined that Baucum was moderately limited in her ability to: (1) carry out detailed instructions, (2) interact appropriately with the general public, and (3) accept instructions and respond appropriately to criticism from supervisors.  Tr. 202-03.  Otherwise, Dr. Suminski did not believe Baucum was significantly limited in any respect.  Id.

Dr. Suminski noted that Baucum had no prior hospitalizations due to her mental impairments and her only treatment was "routine psychiatric outpatient care" that had never required more intensive treatment.  Tr. 204.  Furthermore, Dr. Suminski stated that her "condition [wa]s documented as somewhat improved." Id.  Dr. Suminski also noted that Baucum's memory processes were intact, she could make simple decisions, had adequate impulse control, could maintain

---

[5] The records for Baucum's January 2010 visit are not contained within the administrative record.

socially appropriate behavior, and could perform personal care functions sufficient for acceptable hygiene.  Id.

Dr. Suminski opined that Baucum could sustain an ordinary routine, adapt to routine changes without special supervision, and had "few" restrictions in her understanding, memory, and adaptation.  Id.  Dr. Suminski noted that Baucum's functional capacity was "fairly good," and concluded that, despite the limitations imposed by her mental impairments, Baucum was able to "meet the basic mental demands of competitive work on a sustained basis."  Id.

Dr. Suminski also offered an opinion on the applicability of "paragraph B" criteria to Baucum's impairments under listings 12.02, 12.04, and 12.08.  Tr. 216. Dr. Suminski found that Baucum suffered from only mild restrictions in her activities of daily living; in this respect, Dr. Suminski noted that Baucum cared for her personal hygiene, cared for her young child, did laundry, shopped, managed money, and drove an automobile.  Tr. 204, 216.  Dr. Suminski also opined that Baucum suffered from mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had suffered from no episodes of decompensation.  Tr. 216.  Dr. Suminski also believed that Baucum did not meet the paragraph C criteria for disability under listing 12.04.  Tr. 217.

**B.     Baucum's Symptoms and Subjective Complaints**

At the administrative hearing, Baucum presented testimony regarding the symptoms that accompanied her various impairments.  Tr. 41-52, 55-56.  Baucum stated that she began working as a part-time nurse at Schuylkill Medical Center in April 2010.  Tr. 43-44.  She testified that she worked twice a week, for seven hours each day; her pay was in excess of twenty-nine dollars per hour.  Tr. 44.

Baucum testified that for "the most part" she was able to maintain her own personal care, such as bathing, grooming, and dressing.  Tr. 45.  She also stated that she did not do much in the way of household chores, and she relied on her family to provide a great deal of assistance.  Tr. 46.  Her hobbies included reading "a magazine from time to time" and watching television.  Id.  She did not belong to any clubs, civic groups, or church, and that her mom shopped for her.  Id.  Baucum testified that, with the help of her mother and father with whom she lived, she was able to care for her young child.  Id.

Baucum testified that she had difficulty getting along with people.  Tr. 47.  Her anxiety was particularly heightened when she was dealing with other people.  Tr. 49.  She only obtained approximately five hours of "sound" sleep per night.  Id.  However, Baucum also stated that she felt as though she needed ten to twelve hours of sleep per day plus a three or four hour nap during the day to "feel somewhat normal."  Tr. 50.

Baucum stated that her Zoloft medication did not "totally" work, and that, after being on the medication for years, she expected to be much better off than she was. Tr. 48. She also complained that Vistaril made her "so drowsy that it, it's really only something I can take if I'm going to bed." Id. Baucum also stated that her anxiety made her very short-tempered, irritable, and caused poor concentration. Tr. 55. She testified that her inability to get along well with others caused panic attacks, and this combination led to absenteeism at work. Tr. 55-56.

Prior to the administrative hearing, Baucum's mother, Miriam Baucum, completed a third party function report. Tr. 121-28. She stated that Baucum needed reminders to brush her teeth, sometimes needed reminders to take her medicine, and could not cook her own meals. Tr. 123. She stated that Baucum did laundry twice a week and went outside twice a week, although never alone. Tr. 123-24. She also stated that Baucum went shopping for "baby stuff" once per week, although her mother helped with the shopping. Tr. 124.

Miriam stated that Baucum's hobbies included reading and watching television, which she did about three times each week; these hobbies were hampered by Baucum's short attention span. Tr. 125. She also wrote that the only place Baucum went on a regular basis was "to the mental doctors," where she went once or twice per month. Id. Miriam also stated that Baucum had been fired from

a job due to her inability to get along with others; Baucum also could not handle

stress well, and could not handle a change in routine well.  Tr. 127.

### C.    The Administrative Hearing

On September 9, 2010, Baucum's administrative hearing was conducted.

Tr. 38-57.  After Baucum gave the testimony detailed above, Gerald Keating, an

impartial vocational expert, was called to give testimony.  Tr. 52.

The ALJ asked Mr. Keating to assume a hypothetical individual with

Baucum's age, education, and work experience who was able to work at any

exertional level but could only occasionally climb, balance, or stoop, although the

individual could climb on a ladder.  Tr. 53.  Furthermore, the hypothetical

individual would need to avoid temperature extremes, humidity, vibration, fumes,

and hazards.  Id.  The ALJ further proposed that this hypothetical individual was

limited to simple, routine tasks, and low-stress.  Id.  The ALJ defined low-stress as

"only occasional decision-making required, and only occasional changes in the

work-setting."  Id.  Finally, the ALJ limited this hypothetical individual to only

occasional interaction with co-workers, and no interaction with the public.  Id.

Under this hypothetical, Mr. Keating testified that the individual would not

be able to perform Baucum's past relevant work.  Id.  However, the individual

would be able to perform three jobs that exist in significant numbers in the regional

economy: a marker or labeler, an assembler of small products, or a packer.  Tr. 54.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not

12

substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Commissioner of Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national

economy that a person with the claimant's abilities, age, education, and work experience can perform.  <u>Mason</u>, 994 F.2d at 1064.

## A.      Baucum's Lack of Representation

Baucum argues that the ALJ erred by not adequately explaining "the potential consequences of not having an attorney's representation" at the hearing. The administrative record reflects that Baucum was fully informed of her right to a representative, and the consequences of proceeding without one, but willingly chose to proceed as a pro se claimant.

At the administrative hearing, the ALJ asked Baucum "is it your desire to go forward with this hearing without and attorney or a non-attorney representative?" Tr. 39.  Baucum replied "[y]es."  <u>Id.</u>  The ALJ then asked if Baucum understood "that an attorney or a non-attorney representative could help you gather evidence and present evidence at a hearing?"  <u>Id.</u>  Baucum answered "[y]es.  I understand. I just didn't have time . . ."  <u>Id.</u>  The ALJ further inquired whether Baucum wanted a representative at the hearing; Baucum again replied that she did not.  <u>Id.</u> Specifically, Baucum stated "[w]ell, it, it's too late now. I just didn't – I, I knew that I needed one, but I just didn't have the gumption to arrange for that. So, I'll just move forward without that today."  <u>Id.</u>

Perhaps troubled by Baucum's uncertain response, the ALJ pressed the issue further, and notified Baucum that she could receive a continuance in order to find

an attorney.  Tr. 40.  After the ALJ explained the process of the continuance to

Baucum, Baucum stated that she would "just go forward for today . . ."  Id.  The

ALJ reiterated that she wanted Baucum "to understand that you do have the right

to [a representative] . . ."  Id.  Baucum reiterated that she understood this right.  Id.

     The ALJ also asked Baucum whether she had reviewed information,

included in the notice for the hearing, concerning her right to a representative.  Tr.

39.  Baucum stated that she had "somewhat" reviewed the information.  Id.  The

information informed Baucum of her right to a representative, including attorneys

who would work on a contingent fee basis.  Tr. 72, 74.  Information was also

included about organizations that provide free legal services for qualifying persons.

Tr. 76.

     The evidence establishes that the ALJ more than fulfilled her obligations to

inform Baucum of her right to a representative, and the benefits that a

representative could provide.  Baucum freely and knowingly waived this right.

Additionally, while Baucum argues that she was unable to fully present her case

because she appeared pro se, she does not point to any "clear prejudice or

unfairness" that occurred as a result.  Dobrowlsky v. Califano, 606 F.2d 403, 408

(3d Cir. 1980).  It is possible that, had Baucum been represented, she would have

testified in greater detail regarding her symptoms or activities of daily living.

However, given the ALJ's decision to discount Baucum's credibility regarding her

15

allegations of symptoms and activities of daily living,[6] further testimony on this point likely would have been moot.

**B.**      **The ALJ's Findings at Step Three**

Baucum also contends that the ALJ erred in finding she did not meet or equal either listing 12.04 or 12.08.  It is noteworthy that the ALJ's decision applies to a narrow period of time.  The ALJ concluded that Baucum had engaged in substantial gainful activity from April 2010 through to the time of the administrative hearing, a finding that is not challenged on appeal.  Tr. 16. However, the ALJ found that, after her alleged onset date, Baucum had not engaged in substantial gainful activity for a period that exceeded twelve months. Tr. 16.  Therefore, the ALJ limited her findings to the period from March 1, 2008 to April 2010.  Id.

To be considered disabled at step three of the sequential evaluation process, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations.  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992). "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"  Id., quoting Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990)

_____

[6] As will be discuss infra, the ALJ's decision to discount Baucum's credibility is supported by substantial evidence.

(emphasis in original).  The standard for meeting a listed impairment is higher than the standard for proving disability at steps four and five.  <u>Sullivan</u>, 493 U.S. at 532.

In order to meet the 12.04 or 12.08 listings, a claimant must establish that she or he suffers from that disorder and that the disorder causes two of the following "paragraph B" criteria: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.08.  The 12.04 listing may also be met if a claimant meets the "paragraph C" criteria.  Paragraph C is met where the claimant has a

> [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended duration; or [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04.

i.    <u>Paragraph B Criteria</u>

The ALJ found that Baucum did not meeting listings 12.04 or 12.08 in part because she did not meet the paragraph B criteria.  Tr. 17-20.  In that vein, the ALJ

17

concluded that Baucum suffered from mild restrictions in her activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and had suffered from no episodes of decompensation that lasted for an extended period. Tr. 18-19.

For activities of daily living, the ALJ cited Baucum's ability to tend to her personal care and ability to raise a young child. Tr. 18. The ALJ acknowledged that Baucum claimed she had difficulty with household chores and that her mother did all of the shopping; however, the ALJ cited to a statement, made by Baucum's mother, that Baucum did go shopping and do laundry. Id. The ALJ also found it significant that Baucum was engaged in substantial gainful activity after the alleged onset date. Id.

In regards to social functioning, the ALJ noted that Baucum cared for her young son and worked as a nurse where she cared "for patients and interacte[d] with co-workers and supervisors." Id. The ALJ also stated that Baucum did not have a criminal history or any profuse history of anti-social behavior. Id. The ALJ noted that the evidence did not reflect any difficulties in dealing with authority figures, and there was no evidence that Baucum "isolate[d] herself to a pronounced degree." Id. The ALJ also observed that Baucum was pleasant and cooperative at the administrative hearing and at her medical appointments. Id.

18

Finally, in terms of concentration, persistence, or pace, the ALJ again referenced Baucum's ability to work as a nurse, as well as care for her young child. Tr. 19.  The ALJ also noted Baucum's ability to read and watch television.  Id.

The ALJ's findings mirrored the conclusions put forth by Dr. Suminski, who also believed Baucum had mild restrictions in her activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace.  Tr. 216.  The ALJ found that Dr. Suminski's opinion was well-supported by evidence in the record, and therefore gave great weight to his opinion.  Tr. 22.

The ALJ's reliance on Baucum's work as a nurse was misplaced.  Baucum's work from April 2010 to the time of the administrative hearing was relevant to the evaluation of her credibility, and therefore could legitimately impact the ALJ's assessment of Baucum's self-reported difficulties in concentration, social functioning, and activities of daily living.  Baucum's work was relevant to her credibility because, at the administrative hearing, she described her limitations in the present tense.  The ALJ could therefore properly discount Baucum's testimony that, for example, she could not interact well with others, since this may be inconsistent with working as a nurse at a hospital.

However, Baucum's work as a nurse in April 2010 has nothing to do with her activities of daily living, concentration, or social functioning during periods

19

prior to that employment.  As noted above, the ALJ stated that she was limiting the analysis only to that period of time from Baucum's alleged onset date up to the time she began working as a nurse.  Tr. 16.  Consequently, activities undertaken after this period are irrelevant to the analysis.

Nonetheless, even discounting Baucum's work as a nurse, the remaining evidence relied upon by the ALJ was substantial.   Significantly, the only doctor who offered an opinion on whether Baucum's impairments met or equaled a listing, Dr. Suminski, determined that Baucum did not meet the paragraph B criteria of either listing 12.04 or listing 12.08.  Tr. 216.  See, Washington v. Barnhart, 66 F. App'x 290, 292 (3d Cir. 2003) ("There is other substantial evidence to support the ALJ's determination that [the claimant] did not meet the 12.04 requirements.  Agency psychologists, for example, determined that [the claimant's] depression did not meet or equal the requirements.").  Consequently, the ALJ did not err in finding that Baucum did not meet paragraph B criteria for either listing 12.04 or listing 12.08.

    ii.    Paragraph C Criteria

The ALJ also found that Baucum did not meet the paragraph C criteria of listing 12.04.  Tr. 19.  The administrative record does not contain evidence supporting a single instance of decompensation.  There is also no evidence establishing that even a minimal increase in mental demands or a change in the

environment would cause Baucum to decompensate.  Importantly, Dr. Suminski opined that Baucum would "adapt to routine changes without special supervision" and had "few" restrictions in her ability to adapt.  Tr. 216.  The evidence also reveals that Baucum lived outside of a highly supportive living arrangement throughout the relevant period of time between her alleged onset date and the administrative hearing.  The ALJ's conclusion that Baucum did not meet the paragraph C criteria of listing 12.04 was further buttressed by Dr. Suminski's conclusion that the evidence did "not establish the presence of the 'C' criteria." Tr. 217.  Consequently, the ALJ's conclusion that Baucum's impairments did not meet or equal the paragraph C requirements of section 12.04 is supported by substantial evidence.

### C.     Evaluation of Baucum's Credibility

Baucum next states that the ALJ reached an improper credibility determination regarding Baucum's testimony, particularly regarding her symptoms.  An ALJ's credibility determination is entitled to great deference by the district court.  Refer v. Barnhart, 326 F.3d 876, 380 (3d Cir. 2003).  However, the ALJ's credibility determination must "contain specific reasons for the finding on credibility, supported by the evidence in the case record[.]" SSR 96-7p at *2 (1996).

21

Here, the ALJ adequately supported her findings that Baucum's statements regarding her symptoms were not entirely credible.  The ALJ stated that Baucum was "quite vague and somewhat elusive in describing her limitations" during the administrative hearing.  Tr. 22.  The ALJ also believe that Baucum's employment as a nurse and ability to care for her two year old daughter indicated that her "abilities and activities [were] far greater than what she ha[d] generally reported."  Tr. 23.

The ALJ also believed that the relatively conservative nature of Baucum's treatment, and her questionable compliance with her medication, also militated against Baucum's credibility.  Id.  In this regard, the ALJ noted that Baucum only had occasional counseling sessions, and most of her medical records consisted of visits "for the management of her common psychiatric medication . . ."  Tr. 21.  The ALJ did note that difficulty with insurance prevented treatment for at least some period of time; however, this insurance gap did not account for all of the gaps in treatment, and the ALJ believed that this was further evidence that Baucum's symptoms were not as severe as alleged.  Tr. 22.  Finally, the ALJ found that Baucum's medications had been "relatively effective in controlling [Baucum's] symptoms."  Id.

While none of this evidence is alone dispositive, when viewed as a whole it is substantial enough to support the the ALJ's credibility determination.

Consequently, the ALJ did not err in discounting Baucum's credibility, and did not

err in finding that Baucum's symptoms were less severe than she had alleged.

### D.    Side Effects of Baucum's Medication

Baucum alleges that the ALJ failed to account properly for the effectiveness

and side effects of her medication.  The only side effect Baucum has alleged is

drowsiness from Vistaril and diarrhea from Metformin.[7]  Tr. 48-49.  Baucum

testified that she can only take Vistaril at night due to the drowsiness it causes.  Tr.

48.  While the ALJ did not explicitly address the issue of drowsiness, any error

here was harmless for two reasons.  First, the ALJ found that Baucum's testimony

as a whole was less than credible.  Tr. 22-23.  Second, there is no mention within

the medical records of any drowsiness caused by Baucum's medications; rather,

Baucum twice stated that her medications did not cause side effects.  Tr. 159, 160.

As a result Baucum has not established that explicit consideration of these side

effects would affect the outcome of the case in any way, and remand is not

warranted.  See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

### E.    ALJ's Conclusion That Baucum Could Perform Work at any
###        Exertional Level

Lastly, Baucum argues that the ALJ erroneously concluded that she was able

to perform work at any exertional level.  The ALJ crafted a residual functional

---

[7] Baucum testified that she takes Vistaril for anxiety and Metformin for diabetes.  Tr. 47-48.

capacity determination based on Baucum's impairments and credibly-established symptoms, and did not err in finding she could perform substantial gainful activity.

The ALJ determined that Baucum maintained the capacity to work at any exertional level, but could only occasionally climb, balance, and stoop, although she could never climb ladders.  Tr. 20.  Furthermore, Baucum should avoid temperature extremes, humidity, vibrations, fumes, and hazards.  Id.  The ALJ also found that Baucum was limited to work involving simple, routine tasks and was limited to low-stress jobs that involve only occasional decision-making and only occasional changes in the work setting.  Id.  Finally, the ALJ found that Baucum should only occasionally interact with co-workers, and should never interact with the public.  Id.

The ALJ accommodated all of Baucum's physical impairments.  While Baucum testified that she had back pain, the ALJ noted that she had never been diagnosed with any impairments, nor had she been referred for diagnostic imaging or studies of her back.  Tr. 17.  Be that as it may, the ALJ gave Baucum "the benefit of the doubt" and limited Baucum to only occasional stooping and a work environment that was free of vibrations.  Tr. 20.  Additionally, while the ALJ noted that there was no evidence Baucum's allergies caused her any significant issues, the ALJ accommodated any issues she may have by limiting her exposure to fumes.  Tr. 17, 20.  No doctor suggested that Baucum was physically limited in any

24

way, and there was no suggestion in the administrative record that Baucum's impairments limited her more than the ALJ provided for in the residual functional capacity determination.

The ALJ also adequately accommodated Baucum's mental impairments. Dr. Suminski, the only doctor to offer an opinion on Baucum's mental limitations, opined that she was moderately limited in her ability to carry out detailed instructions, as well as in her ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 202-03. The ALJ accommodated these limitations by limiting Baucum to simple, routine tasks and jobs that were low stress and only involved occasional decision-making and occasional changes in the work setting. Tr. 20. Dr. Suminski also believed that Baucum had moderate difficulties in her ability to interact appropriately with the general public. Tr. 202. The ALJ accommodated this by limiting Baucum to only occasional interaction with co-workers, and no interaction whatsoever with the general public. Tr. 20.

The ALJ conveyed this residual functional capacity to an impartial vocational expert. Tr. 53. Based on this information, the vocational expert testified that the individual would be able to perform jobs that exist in significant numbers in the regional economy. Tr. 54. In turn, the ALJ properly relied upon that expert testimony in determining that Baucum was not disabled at step five of the sequential evaluation process. Tr. 23-24. Consequently, the ALJ's

determination that Baucum could perform work at any exertional level is supported by substantial evidence.

### F.    New Evidence

Finally, Baucum has submitted new evidence that she urges is "important to the establishment of repeated episodes of decompensation and continued mental and physical health impairments."  Some of the evidence submitted pertains to the period prior to the ALJ's determination, while some evidence pertains to Baucum's mental and physical status after the ALJ's determination.

Sentence six remand is warranted "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Milano v. Comm'r of Soc. Sec., 152 F. App'x 166, 171 (3d Cir. 2005), quoting 42 U.S.C. § 405(g).  Evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding." Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990).  "The materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Szubak v. Sec'y of Health and Human Servs., 745 F.2d 831, 833 (3d Cir.1984).  Furthermore, "an implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and

that it not concern evidence of a later-acquired disability or of the subsequent

deterioration of the previously non-disabling condition." Id.

The evidence submitted by Baucum does not meet the materiality standard

for remand.   There is no reasonable possibility that the evidence that did pertain to

the time period prior to the ALJ's decision would have had any impact on that

decision.  For example, records from Angela Ambrosia, M.D. during December

2009 and January 2010 indicated that Baucum's anxiety and depression were

"stable," and that she should continue with her medication without change.  Tr.

252.  These records also indicated that Baucum had no complaints and no side

effects from her medication.  Tr. 270.  In March 2010, Dr. Ambrosia noted that

Baucum's depression was unchanged from the previous appointment.  Tr. 281.

In contrast, the evidence relating to Dr. Newton's treatment records

spanning from June 2011 to June 2012, submitted with Baucum's brief, may well

show a serious deterioration in Baucum's mental impairments.  The records often

indicated mood and affect issues, and Dr. Newton consistently assigned GAF

scores of 40 or 45, indicative of serious symptoms.  However, these records are not

material because they do not relate to the time period for which benefits were

denied.  Szubak, 745 F.2d at 833.  Rather, the evidence indicates a "subsequent

deterioration of the previously non-disabling condition," at most, for which remand

is not appropriate.  Id.  Consequently, remand is not warranted based on the

evidence submitted post-hearing.[8]

**Conclusion**

A review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. §

405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.


BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: June 3, 2014

---

[8] Baucum has not presented an argument that the evidence is "new" or that good caused existed for the failure to submit these records to the ALJ.  Good cause may well exist due to the fact that Baucum proceeded pro se at the administrative hearing.  See, Szubak, 745 F.2d at 834. However, in light of the fact that the evidence was not material, it is not necessary to decide if the evidence was new, or if good cause existed for the Baucum's failure to present the evidence to the ALJ.